IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JOSHUA WILSON, | ) | Case No. 5:18-cv-335 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | THOMAS M. PARKER |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | **MEMORANDUM OF OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

## I.      Introduction

Plaintiff, Joshua Wilson, seeks judicial review of the final decision of the Commissioner of Social Security (the "Commissioner") denying his applications for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act. This matter is before the court pursuant to 42 U.S.C. § 405(g) and 1383(c)(3), and the parties consented to my jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  ECF Doc. 12. Because the ALJ failed to apply proper legal standards and reach a decision supported by substantial evidence, the Commissioner's final decision denying Wilson's applications for disability insurance benefits and supplemental security income must be VACATED and the case REMANDED for further proceedings consistent with this memorandum of opinion and order.

## II.      Procedural History

On January 30, 2015, Wilson protectively filed for disability insurance benefits and supplemental security income.  (Tr. 212–19).  Wilson alleged that he became disabled on

November 17, 2012, due to "severe chronic anxiety [and] slight agoraphobia."[1] (Tr. 84, 97, 212, 214). The Social Security Administration denied Wilson's applications initially and upon reconsideration. (Tr. 84–10, 112–137). Wilson requested an administrative hearing. (Tr. 163–64). Administrative Law Judge ("ALJ") Michael F. Schmitz heard Wilson's case on May 5, 2017, and denied the claim in a June 6, 2017, decision. (Tr. 12–31, 35–83). On January 19, 2018, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1–6). On February 12, 2018, Wilson filed a complaint to seek judicial review of the Commissioner's decision. ECF Doc. 1.

## III. Evidence

### A. Personal, Educational and Vocational Evidence

Wilson was born on December 24, 1981, and he was 30 years old on the alleged onset date. (Tr. 212, 214). He had a high school education with some additional vocational training in electronics, and past relevant work as an auto parts dealer, baker helper, and security officer. (Tr. 76–77, 250–51).

### B. Relevant Medical Evidence

On July 2, 2013, Wilson saw Andrea Jopperi, D.O., and reported, for the first time, that he had anxiety and was "not very social." (Tr. 331). He told Dr. Jopperi that he "ha[d] never been treated for or diagnosed with anxiety before." (Tr. 331). At a follow-up on September 23, 2013, Wilson told Dr. Jopperi that he had anxiety and mild depression, and he started seeing a psychologist. (Tr. 334). Dr. Jopperi noted that Wilson reported having a suicidal reaction to SSRIs in the past, and she stated that she would refer Wilson to a psychiatrist if he and his

---

[1] Wilson also alleged that he became disabled on November 17, 2012, due to tachycardia; however, he does not raise before this court any issues related to his alleged physical impairments. (Tr. 84, 97, 212, 214); *see generally* ECF Docs. 13 and 16.

psychologist decided he needed medication. (Tr. 335). On October 16, 2013, Wilson told Dr. Jopperi that he felt like he was dying sometimes, was scared to drive or leave the house, and frequently woke up at night worrying. (Tr. 337). Dr. Jopperi prescribed him Ativan (an antianxiety sedative) for his panic attacks and Prozac (an SSRI used to treat panic disorder) for daily treatment. (Tr. 338). On October 29, 2013, Wilson told Dr. Jopperi that his anxiety had become worse since starting Prozac, that he wanted to try a different medication, and that he had panic attacks. (Tr. 340). Dr. Jopperi noted that Wilson did not start his Prozac right away after it was prescribed, and she prescribed him a different SSRI. (Tr. 340–41). On November 22, 2013, Wilson told Dr. Jopperi that he "fe[lt] a little better but [was] still very anxious when he le[ft] the house," and that he saw a therapist every two weeks. (Tr. 342). Dr. Jopperi continued Wilson's medications and "wrote a letter stating he can't work until he gets his anxiety better controlled." (Tr. 343).

On September 17, 2013, Wilson began counseling with Jennifer Morgan, Psy.D., at Wellspring Counseling Center. (Tr. 649). Dr. Morgan noted that Wilson reported feeling anxiety and depression, and had stress related to living with family members and adjusting to parenthood. (Tr. 649). She stated that Wilson "was not interested in taking medication to help manage his psychological symptoms because he did not like side effects from the medications." (Tr. 649). Dr. Morgan terminated counseling with Wilson on February 20, 2014, because he had missed two scheduled sessions. (Tr. 649).

On March 31, 2014, Wilson told Dr. Jopperi that he did not want to increase his SSRI, that he took Ativan when he was around a lot of people, and that he was discharged from counseling for not showing up, but "want[ed] to try again somewhere else." (Tr. 348). He also asked for another note stating that he could not work due to his anxiety in public. (Tr. 348). On

July 7, 2014, Wilson told Dr. Jopperi that he had trouble being around a lot of people, did not leave the house much, and did not make an appointment with another counselor, and Dr. Jopperi continued his medications. (Tr. 354–55). On October 14, 2014, Wilson told Dr. Jopperi that he called Coleman Behavioral Center to make a counseling appointment, but they never called him back. (Tr. 360). He stated that he felt stable at home, but took Ativan when he had to go in public. (Tr. 360). On January 13, 2015, Wilson told Dr. Jopperi that he made an appointment to see a psychiatrist on his counselor's recommendation, went to the grocery store at night when less people were there, did not like family functions, and felt he could not work due to his fear of being around people. (Tr. 372). On September 30, 2015, Wilson told Dr. Jopperi that his Ativan did not work when he had a bad panic attack after going to a grocery store, and that he stayed inside most of the time. (Tr. 555). On January 24, 2017, Wilson said that his psychiatrist told him "he likely will never improve," and Dr. Jopperi noted that Wilson rarely left his home and could not go into public places, but walked his dog every day. (Tr. 600).

On December 18, 2014, Wilson began counseling at Coleman Behavioral Health. (Tr. 464–84). Wilson told counselor Stephanie Goeden, LSW, that he had "agoraphobia type anxiety," had difficulty leaving his house and driving, felt "lost/surreal" and could not breathe when he pushed himself to go places, and felt "safe/secure" at home. (Tr. 464, 476). He told Goeden that he did not like crowds, took Ativan to go to the grocery store, used online forums, attended church regularly, and cared for a puppy and his daughter while at home. (Tr. 482). Goeden noted that Wilson's physician prescribed Ativan and Lexapro for his anxiety, diagnosed him with anxiety, and gave him a GAF score of 42. (Tr. 464, 483). On January 28, 2015, Wilson told counselor Ericka Schoaff, PC, that he was less agitated and calmer because his girlfriend and child were out of the house, that he left his house with his brother in law for a full

4

day after taking his medications, and that he had left his house for a few minutes after having an argument with his girlfriend. (Tr. 486). On February 11, 2015, Wilson told Schoaff that he had increased anxiety because he did not like the way his girlfriend treated him, he had conflicts with his girlfriend over parenting styles, and he had a pending child support hearing. (Tr. 489). At follow-ups on July 24, 2015, and August 14, 2015, Schoaff noted that Wilson had a tangential thought process and "unhelpful thinking habits." (Tr. 521, 523–24).

On March 3, 2015, Wilson saw Jonathan Sarsiat, D.O., at Coleman Behavioral Health. (Tr. 500–07). Wilson told Dr. Sarsiat that he was "anxious much of his life, but never knew [what] the problem was." (Tr. 500). He said that he worried about driving, grocery shopping, public speaking, leaving the house, and "what if" thoughts. (Tr. 500). Dr. Sarsiat diagnosed Wilson with agoraphobia with panic disorder and continued his medications. (Tr. 505–06).

On July 7, 2015, Wilson saw Steffany Morton, M.D., at Coleman Behavioral Health. (Tr. 508–13). Wilson told Dr. Morton that he was doing okay, but still had "a significant amount of anxiety about leaving his home." (Tr. 508). Dr. Morton noted that Wilson was medication compliant, and that his medications helped improve his symptoms and allowed him to "tolerate being away from home for short periods." (Tr. 508). She also noted that Wilson worried excessively and had panic attacks. (Tr. 508). Dr. Morton diagnosed Wilson with agoraphobia with panic disorder and continued his medications. (Tr. 510, 512). At a follow-up on August 10, 2015, Dr. Morton noted that Wilson felt depressed and had poor concentration, and Wilson complained of stress related to issues with his girlfriend, ex-girlfriend, and mother. (Tr. 514). Medical records indicate that Dr. Morton adjusted Wilson's medications during visits on November 23, 2015, and January 5, 2016.[2] (Tr. 546, 540, 534). At follow-up appointments

---

[2] Wilson did not submit to the ALJ records from his visits between August 2015 and March 2016. ECF Doc. 13, Page ID# 728. He attached records from that period to his merits brief, but does not seek to

on March 7, 2016, April 18, 2016, May 23, 2016, and June 21, 2016, Wilson reported to Dr. Morton that he was doing okay, but he was concerned about issues with his friends provoking other people in the neighborhood; babysitting a 1 year old, a 5-year-old, and his 3-year-old daughter; and his relationship with his girlfriend. (Tr. 528, 534, 540, 546). On March 7, 2016, Wilson said that he had an anxiety attack at his friend's house, and on April 18, 2016, he said that his girlfriend hit him and his daughter. (Tr. 534, 546). On October 26, 2015, December 22, 2015, and June 21, 2016, Dr. Morton wrote letters stating that Wilson had regularly attended medical management since April 2015 and counseling since December 2014 for his anxiety and panic attacks, and that Wilson was unemployed due to his anxiety and discomfort in public places. (Tr. 527, 653–54).

On September 1, 2016, Wilson saw Dr. Richard Ulrich, M.D., at Coleman Behavioral Health. (Tr. 594). Dr. Ulrich noted that Wilson stopped taking his antidepressant and a blood pressure medication because he had stomach aches. (Tr. 594). Wilson told Dr. Ulrich that his anxiety caused him to wake up six times per night, struggle leaving the house, and have difficulty going to the market. (Tr. 594). Wilson also reported that his panic attacks were getting worse, and that he was stressed about his daughter starting school and issues with his girlfriend. (Tr. 594). At follow-ups on September 15, 2016, September 29, 2016, October 4, 2016, October 25, 2016, November 15, 2016, December 12, 2016, January 17, 2017, February 7, 2017, and March 7, 2017, Dr. Ulrich did not note any significant changes in Wilson's condition and continued his antianxiety medications. (Tr. 564–93, 633–47). Wilson primarily expressed concerns regarding stress from his relationship with his girlfriend and parenting. (Tr. 569, 574,

admit them as substantive evidence before this court because they are redundant to the records showing that he was treated between August 2015 and March 2016. *Id.*; *see also* Doc. 13-1 (Coleman records from September 2015 through February 2016).

579, 589, 638). On September 29, 2016, Wilson told Dr. Ulrich that he had to leave a parent-teacher meeting after 15 minutes because he had a panic attack, and that his Ativan made him drowsy but helped with his anxiety. (Tr. 584). On November 15, 2016, he told Dr. Ulrich that he had to leave a flea market after 20 minutes, and on December 12, 2016, he had an anxiety attack after he went to an auction with his daughter. (Tr. 564, 569). On January 17, 2017, Wilson said that he had anxiety because the "ODJFS" made him go to job training to keep his food card, and he did not think he could handle it. (Tr. 643). On October 4, 2016, February 7, 2017, and March 7, 2017, Dr. Ulrich wrote letters stating that Wilson had regularly attended medical management since April 2015 and counseling since December 2014 for his anxiety and panic attacks, and that Wilson was unemployed due to his anxiety and discomfort in public places. (Tr. 650–52).

### C. Relevant Opinion Evidence

#### 1. Examining Psychologist—Gary J. Sipps, Ph.D.

On May 7, 2015, Wilson saw Gary J. Sipps, Ph.D., for a consultative examination on referral from Ohio Disability Determination Services. (Tr. 494–99). Dr. Sipps noted that Wilson had psychological treatment from when he was 5 years old until he was 18 years old, and that he received intermittent treatment as an adult. (Tr. 495). Dr. Sipps stated that Wilson was diagnosed with anxiety with agoraphobia, for which he took an SSRI and Ativan. (Tr. 495). In describing his daily activities, Wilson told Dr. Sipps that he took care of his dog and daughter, enjoyed gardening, spent time on the internet, sold objects on eBay, slept between 8:00 pm and 3:00 am, repaired furniture, worked with his hands, watched movies, read about history, and listened to music. (Tr. 495). Wilson said that he interacted with his mother and brothers and greeted his neighbor, but he did not have many friends because "most cannot understand [his]

circumstances and have 'abandoned' him." (Tr. 495). He vacuumed his floors, took out the trash, and attended to his personal hygiene. (Tr. 495). Dr. Sipps noted that Wilson "was cooperative in manner . . . [,] appeared to exert an effort to respond to what was requested of him[, and] maintained appropriate eye contact throughout the interview." (Tr. 495). Wilson had "overt signs of anxiety," including stress when leaving his house (his "safe zone"), difficulties going to public places even when they are not crowded, and panic attacks. (Tr. 496). Dr. Sipps noted that Wilson benefitted "somewhat" from his psychiatric treatment, and that he was able to pursue his interests and maintain his responsibilities within his household. (Tr. 497). Dr. Sipps diagnosed Wilson with "panic disorder with agoraphobia in partial remission with medication," and gave him an overall GAF score of 50. (Tr. 497).

In assessing Wilson's functional abilities, Dr. Sipps stated that Wilson was not limited in his ability to: (1) understand instructions; (2) maintain attention, concentration, persistence, and pace; (3) perform simple or multi-step tasks; and (4) respond appropriately to supervision and coworkers in a work setting. (Tr. 497–98). Nonetheless, Wilson's anxiety caused limitations to his ability to remember instructions and interact with the general public. (Tr. 497–98). Dr. Sipps stated that Wilson's ability to respond appropriately to work pressures would depend on his working conditions because he would not face any difficulties working from home, but working outside the home would exacerbate his anxiety "at least initially." (Tr. 498). Dr. Sipps stated that Wilson could improve his capacity to handle work pressure outside the home with accommodation and ongoing psychological intervention; "[h]owever, in the interim, he would appear limited in his ability to respond appropriately to work pressures in a work setting." (Tr. 498).

## 2.     State Agency Consultants

On June 18, 2015, state agency psychological consultant Paul Tangeman, Ph.D., reviewed Wilson's medical records and determined that Wilson had moderate restrictions in his daily living activities and social function, and mild restrictions in maintaining concentration, persistence, and pace.  (Tr. 90, 103).  Dr. Tangeman indicated that Wilson's subjective symptom complaints were partially credible, insofar as he had agoraphobia and anxiety attacks in crowded areas, but he was able to attend appointments and go to the grocery store.  (Tr. 91, 104).  He stated that Wilson was moderately limited in his ability to: (1) understand, remember, and carry out detailed instructions; (2) complete a normal workday and workweek without interruptions from psychologically based symptoms; (3) interact appropriately with the general public; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and (4) respond appropriately to changes in the work setting.  (Tr. 92–93, 105–06).  Wilson was not significantly limited in his ability to: (1) remember locations and work-like procedures; (2) understand, remember, and carry out simple and routine instructions; (3) maintain attention and concentration for extended periods; (4) perform activities within a schedule; (5) maintain regular attendance; (6) be punctual within customary tolerances; (7) sustain an ordinary routine without special supervision; (8) make simple work-related decisions; (9) perform tasks at a consistent pace with normal breaks with infrequent interruptions in routine; (10) ask simple questions or request assistance; and (11) accept instructions and respond appropriately to criticism from supervisors.  (Tr. 92–93, 105–06).  Dr. Tangeman also stated that "[s]upervisory correction should be non-confronting and constructive."  (Tr. 93, 106).  On October 24, 2015, state agency consultant Irma Johnston, Psy.D., reviewed Wilson's medical records and concurred with Dr. Tangeman's opinion.  (Tr. 117–21, 130–34).

## D. Relevant Testimonial Evidence

Wilson testified at the ALJ hearing.  (Tr. 41–74).  He stated that he lived with his girlfriend and six-year-old daughter.  (Tr. 41).  Other than cooking and cleaning, Wilson also cut the grass and took his dogs "on a leash out in the side yard, usually very quickly, in and out." (Tr. 63–64).  He saw his mother twice a month.  (Tr. 42).  He rarely went to his brother's house, which was "five minutes down the street," but took his daughter there to dye Easter eggs.  (Tr. 64).  He sometimes drove himself to his treatment appointments and once or twice a week to the store, but his girlfriend usually drove him because the antianxiety medication he had to take before going out made him feel drowsy.  (Tr. 43–44, 67).  He did not get along with one neighbor, but talked to another neighbor "once in a while."  (Tr. 43).  For money, he sold stuff online, including furniture that he fixed in his house; however, he did not think he could handle a job fixing furniture, because his fear of confrontation with a supervisor or coworker would cause him to panic.  (Tr. 43, 73).  He felt safe at home and was able to function there, but he did not feel safe when he went out.  (Tr. 68).  When he went to the grocery store every couple months, he felt like he could not breathe and clammed up.  (Tr. 68).  When he went to a parent-teacher's conference for his daughter, he had to go outside due to a panic attack.  (Tr. 54–65).  He enjoyed watching movies on the History Channel, but he sometimes had to get up and missed the movie. (Tr. 63).

Wilson stated that he started being afraid of people around him when he was 14, and it got worse over the years; however, he did not get treatment early on because he did not know what the issue was and he did not have medical insurance.  (Tr. 45, 58).  His anxiety caused him to have 10 to 20 panic attacks per week that lasted about an hour and left him feeling exhausted. (Tr. 65–66).  His anxiety also caused him to have difficulty sleeping due to nightmares and

physical symptoms including acid reflux, stomach issues, headaches, increased heart rate. (Tr. 54–56, 71–72). He rarely left his house because he was afraid that something would happen to him, he would forget whether he took his pills or turned off appliances, his thoughts were not clear in crowded places, and he would have to lock himself in the restroom to avoid "freaking out" in front of other people. (Tr. 55, 62, 70). He first sought treatment with Dr. Jopperi, who recommended that he get counseling. (Tr. 58). He went to Wellspring because Coleman had a long waiting list for clients; however, he quit going to treatment sessions at Wellspring because he felt their Christian-based counseling program did not help his problems and his counselor did not help him deal with his anxiety. (Tr. 58–59). He stated that he "clicked" well with Dr. Ulrich, who gave him journaling activities to help him work through his anxiety, but he did not do the journaling activities because he was skeptical regarding whether they would work. (Tr. 59–60). He panicked before 80% to 90% of his treatment appointments. (Tr. 66). His medications helped his symptoms, but they made him feel drowsy. (Tr. 61).

Wilson testified that he last worked at a bakery for four to six months in 2009 and 2010. (Tr. 46). He stated that he missed about four or five days total due to his agoraphobia, but he gave the bakery a different reason for missing work. (Tr. 46). He stated that he had a demanding supervisor who made him feel uncomfortable, and he had issues with taking a lot of unscheduled restroom breaks. (Tr. 46–47). He quit because he had anxiety and panic attacks at the thought of going back to work in the mornings. (Tr. 47). Before working at the bakery, he worked as a security truck driver for five months, which he stopped doing after he got a traffic ticket. (Tr. 48–49, 51). He had one disagreement with a supervisor regarding a "situation that happened in [his] truck" and an anxiety attack when a coworker pulled a gun on him after he hit a curb. (Tr. 49–50). He also worked for six months as a car salesman, but left his job because a

sales manager made sexual advances on him.  (Tr. 50).  He stated that he did not talk to his

coworkers other than his desk partner, and that he missed five or six days due to his anxiety.  (Tr.

50).  He also worked at a pet store on commission and as a nighttime security guard.  (Tr. 51–

52).  He quit his nighttime security guard job because he was transferred to a new location where

his supervisor was murdered, and he "couldn't do it anymore."  (Tr. 53).  He had two other

nighttime security guard jobs before that, during one of which he was attacked by someone and

ended up in the hospital.  (Tr. 53).

     Daniel Simoni, a vocational expert ("VE"), also testified at the hearing.  (Tr. 74–81).  The

ALJ told asked the VE whether a hypothetical individual with Wilson's age, experience, and

work history could perform any jobs if he had no exertional limitations, and:

> [was] able to perform simple, routine and repetitive tasks, but not at a production
> rate pace, would be able to respond appropriately to occasional[] changes in a
> routine work setting as long as any such changes were gradually introduced, and
> easily explained and/or demonstrated in advance.  The individual would be able to
> interact frequently with supervisors, but only interact on an incidental, superficial
> basis with coworkers, and the general public.  Superficial would be defined as no
> sales, arbitration, negotiation, conflict resolution, group tasks, or management, or
> direction of others.

(Tr. 77–78).  The VE testified that such an individual could perform Wilson's previous job as a

baker helper, or he could work as a hand packager, inspector and hand packager, or

housekeeping cleaner.  (Tr. 78).  The VE testified that if the individual described in the

hypothetical's ability to interact with supervisors were reduced from frequent to occasional, all

work would be precluded.  (Tr. 79).

     On examination by Wilson's attorney, the VE testified that any absenteeism over one day

per month would preclude work, and that a person could not work if he needed to take one or

two 20-minute breaks per day, beyond the standard 15-minute morning and afternoon breaks and

half-hour lunch break.  (Tr. 80).  Further, the VE testified that there would be no way to assess

whether an individual could work if his interaction with supervisors were limited to constructive advice or correction, and could never be confronting of the employee, because "that is not a function of the job itself, it's a function of the personality of the supervisor." (Tr. 80).

## IV. The ALJ's Decision

The ALJ's June 6, 2017, decision found that Wilson was not disabled and denied his applications for supplemental security income and disability insurance benefits. (Tr. 15–26). The ALJ determined that Wilson had not engaged in substantial gainful activity since November 17, 2012, the alleged onset date. (Tr. 17). The ALJ also found that Wilson had "the following severe impairments: anxiety disorder, depression, and panic disorder with agoraphobia." (Tr. 17). The ALJ determined that Wilson had no impairment or combination of impairments that met or medically equaled the severity of any of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1. (Tr. 18–20). Further, the ALJ determined that Wilson had the residual functional capacity ("RFC") to:

> perform a full range of work at all exertional levels, but with the following nonexertional limitations: The claimant can perform simple, routine, and repetitive tasks, but not at a production rate pace. He can respond appropriately to occasional changes in a routine work setting, as long as any such changes are gradually introduced and easily explained and/or demonstrated in advance. The claimant can interact frequently with supervisors, but interact only on an incidental and superficial basis with co-workers and the general public. Superficial is defined as no sales, arbitration, negotiation, conflict resolution, group tasks, or management or direction of others.

(Tr. 20).

In assessing Wilson's RFC, the ALJ explicitly stated that he "considered all symptoms" in light of the medical and other evidence in the record. (Tr. 20). The ALJ stated that Wilson's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the ALJ found that Wilson's complaints regarding the intensity,

persistence, and limiting effects of his symptoms were "not entirely consistent with the medical evidence and other evidence in the record."  (Tr. 21).  The ALJ stated that evidence showed that, notwithstanding the alleged onset date of November 2012, Wilson did not seek treatment for his anxiety until July 2013 and did not receive medications until October 2013.  (Tr. 21).  The ALJ also noted Dr. Morgan[3] treated Wilson from September 2013 until treatment was terminated for failing to attend sessions in February 2014, and that Dr. Morgan noted that Wilson did not want to take medications during that time.  (Tr. 22).  The ALJ noted that "the bulk of [Wilson's] treatment [in 2014] consisted of medications through his primary care physician," and that he established care with a new mental health provider in December 2014.  (Tr. 22).  The ALJ also noted that Wilson "had a several month gap in treatment at Coleman" between August 2015 and March 2015, and that he continued to see his psychiatrist at Coleman on a monthly basis in 2017.  (Tr. 23).  The ALJ noted that Wilson did not like crowds or tight spaces, but said that he attended church regularly.  (Tr. 22).  He also noted that Wilson had panic attacks when he went to a friend's house and a parent-teacher meeting, felt he could not handle job training that he had to do, and that he indicated that he rarely left home and could not go in public places; however, Wilson walked his dog outside daily.  (Tr. 23).

The ALJ noted that Wilson had GAF scores of 42 in late 2014 and early 2015, but that his GAF scores had a "consistent upward trajectory" and were consistently in the 60s range by the end of 2016, indicating that his symptoms had improved to mild or moderate levels.  (Tr. 22–23).  Nonetheless, the ALJ stated that he gave the "GAF scores in the record[] little weight or consideration as [a GAF score] is just a snapshot in time."  (Tr. 22).  The ALJ stated that he gave

---

[3] The ALJ's opinion states that Wilson saw Margaret Oeschger, Ph.D. – the psychologist whose name appears on Dr. Morgan's letter head.  (Tr. 22).  Nonetheless, during the hearing Wilson stated that Dr. Morgan was his counselor.  (Tr. 59).

Dr. Sipps' opinion—that Wilson's anxiety would limit his ability to function in the workplace—great weight, because it was consistent with the record. (Tr. 24). The ALJ noted that Dr. Sipp's opinion—that Wilson would have difficulty interacting with the general public, but not people in the workplace—was particularly consistent with evidence showing that Wilson struggled in public places, but could walk his dog, socialize with family members, attend appointments, and interact with people familiar to him. (Tr. 24). The ALJ did not comment on Dr. Sipp's statement regarding Wilson's ability to respond appropriately to work pressures in a work setting. (Tr. 24). The ALJ also gave Dr. Tangeman's and Dr. Johnston's opinions great weight, because they were consistent with Dr. Sipp's consultative examination opinion, Wilson's treatment history, and Wilson's daily living activities. (Tr. 24). The ALJ noted that Dr. Tangeman and Dr. Johnston stated that Wilson's "supervisory correction should be non-confronting and constructive," but did not directly comment on that part of their opinions. (Tr. 24).

Based on the VE's testimony and Wilson's RFC, the ALJ found that Wilson was "capable of performing past relevant work as a baker helper." (Tr. 24). The ALJ also found that Wilson could work as a hand packager, inspector and hand packager, and housekeeping cleaner. (Tr. 25). In light of his findings, the ALJ determined that Wilson was not disabled from November 17, 2012, through the date of his decision and denied Wilson's applications for supplemental security income and disability insurance benefits. (Tr. 26).

## V.     Law & Analysis

### A.     Standard of Review

The court's review is limited to determining whether the ALJ applied proper legal standards and reached a decision supported by substantial evidence. 42 U.S.C. §§ 405(g) and

1383(c)(3); *Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence is any relevant evidence, greater than a scintilla, that a reasonable person would accept as adequate to support a conclusion. *Rodgers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Under this standard of review, a court cannot decide the facts anew, make credibility determinations, or re-weigh the evidence. *See* 42 U.S.C. §§ 405(g), 1383(c)(3) (providing that, if the Commissioner's findings as to any fact are supported by substantial evidence, those findings are conclusive); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003) ("Upon review, we are to accord the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which we do not, of observing a witness's demeanor when testifying."). Even if the court does not agree with the Commissioner's decision, or substantial evidence could support a different result, the court must affirm if the Commissioner's findings are reasonably drawn from the record and supported by substantial evidence. *See Elam*, 348 F.3d at 125 ("The decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Rogers*, 486 F.3d at 241 ("[I]t is not necessary that this court agree with the Commissioner's finding, as long as it is substantially supported in the record."). This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without risking being second-guessed by a court. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Though the court's review is deferential, the court will not uphold the Commissioner's decision if the ALJ failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by

substantial evidence, however, a decision of the Commissioner will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, however, we review decisions of administrative agencies for harmless error. Accordingly, . . . we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." (citations and quotation omitted)). Furthermore, the court will not uphold a decision, even when supported by substantial evidence, when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010). Requiring an accurate and logical bridge ensures that a claimant will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to supplemental security income or disability benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P; (4) if not, whether the claimant can perform her past relevant work in light of her RFC; and (5) if

not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. §§ 404.1520(a)(4)(i)–(v) and 416.920(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). The claimant bears the ultimate burden to produce sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. §§ 404.1512(a) and 416.912(a).

### B. Subjective Symptom Complaints

Wilson argues that the ALJ failed to apply proper legal procedures and reach a conclusion supported by substantial evidence in determining that his subjective symptom complaints were not consistent with other evidence in the record. ECF Doc. 13, Page ID# 723–29. He asserts that evidence in the record is consistent his claims that his medically determinable impairments would cause him to miss work more than once per month, require at least one extra 20-minute break per day, be limited to only occasional interactions with supervisors, and need non-confrontational or constructive supervisory correction. *Id.* at 723–29. Wilson asserts that the ALJ erroneously: (1) focused on what Wilson was able to do at home, which is irrelevant given his agoraphobia; (2) gave undue weight to Wilson's delayed treatment and missed counseling appointments without considering how his agoraphobia affected his ability to seek treatment; (3) failed to inquire at the hearing about a 2014 treatment note indicating that Wilson attended church regularly; and (4) gave too much weight to Wilson walking his dog daily, when Wilson testified that he walked his dog only in his side yard and was quickly in and out of the house. *Id.* Furthermore, Wilson notes that, although his treatment provider failed to provide counsel with certain medical records between August 2015 and March 2016, the ALJ erroneously determined that there was a gap in his treatment because other records indicated that

he had treatment sessions during that time and the ALJ failed to inquire about the gap at the hearing.[4]

The Commissioner responds that the ALJ properly considered Wilson's treatment history, as well as his activities of daily living, gave good reasons for finding that his subjective symptom complaints were not entirely consistent with the record, and reached a decision supported by substantial evidence.  ECF Doc. 15, Page ID# 785–93.  The Commissioner argues that the ALJ's decision was supported by evidence that: (1) Wilson delayed treatment from the onset date in November 2012 until July 2013; (2) he refused medications and missed treatment sessions between September 2013 and February 2014; (3) he did not receive treatment from February 2014 to December 2014; and (4) medication management helped control his symptoms.  *Id.* at 786–87.  The Commissioner asserts that, even if Wilson did not have a gap in treatment between August 2015 and March 2016, the treatment gaps from November 2012 to July 2013 and February 2014 to December 2014 sufficiently supported the ALJ's finding that Wilson had a minimal treatment history.  *Id.* at 792.  The Commissioner also contends that the ALJ was permitted to rely on Wilson's daily activities, including his limited dog walking, even though most of his activities taking place at home.  *Id.*  Furthermore, the Commissioner argues that the ALJ properly explained that Wilson's mental health symptoms were due to stress arising from transient family and financial issues, rather than an ongoing mental pathology.  *Id.* at 787–88.  Finally, the Commissioner asserts that the ALJ adequately controlled for the limitations caused by Wilson's mental health symptoms in limiting the types of tasks, places of work, types of changes in work setting, and degree of interaction in his RFC.  *Id.* at 790.

---

[4] Wilson submitted the missing treatment records with his merits brief to "provide corroboration for the fact that Wilson did not have a gap in treatment and that the ALJ's concern about this could have been addressed . . . at the hearing."  ECF Doc. 13, Page ID# 728.  He states that "these records are not being submitted for their content, as they are untimely and redundant, and thus immaterial."  *Id.*

Wilson replies that many of the Commissioner's arguments are improper *post hoc* rationalizations, including that his February 2014 to December 2014 treatment gap and family stress were inconsistent with his subjective complaints. ECF Doc. 16, Page ID# 804–05, 808–09. He reiterates his arguments that: (1) the ALJ did not adequately consider his agoraphobia as the reason for his treatment gaps, despite the regulations requiring the ALJ to consider the reasons for treatment noncompliance; and (2) his daily living activities at home did not show that he could work outside the home. *Id.* at 804–06, 809–10. Further, Wilson adds that the Commissioner's conservative treatment and effective medication arguments are inapplicable, because the ALJ did not point to any more intensive treatment that would have been available and Wilson did not significantly improve from medications. *Id.* at 806–08. He also adds that the Commissioner incorrectly argues that he refused medications from September 2013 through February 2014, as he took medications prescribed by his primary care physician throughout the relevant period. *Id.* at 805. Finally, Wilson argues that the ALJ did not give sufficiently specific reasons for discrediting his subjective complaints. *Id.* at 810.

A claimant's "[s]ubjective complaints of pain or other symptoms may support a claim of disability." *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989). Generally, a claimant must show that: (1) there is evidence underlying medical condition that causes the allege symptoms; and (2) either (a) objective medical evidence confirms the severity of the alleged pain, or (b) the objectively determined medical condition is so severe that it can be reasonably expected to cause the alleged symptoms. *Id.* (citing *McCormick v. Sec'y of Health & Hum. Servs.*, 861 F.2d 998, 10003 (6th Cir. 1988), and *Duncan v. Sec'y of Health & Hum. Servs*, 801 F.2d 847 (6th Cir. 1986)).

Nevertheless, an ALJ is not required to accept a claimant's subjective symptom complaints. *See Jones*, 336 F.3d 469, 475–76 (6th Cir. 2003). If objective medical evidence does not substantiate the alleged intensity, persistence, and limiting effects of a claimant's symptoms, the ALJ must look to the other evidence in the record. SSR 12-2p, 77 Fed. Reg. at 43643; *see also* SSR 16-3p, 82 Fed. Reg. 49462, 49465 (Oct. 25, 2017) ("We will consider an individual's statements about the intensity, persistence, and limiting effects of symptoms, and we will evaluate whether the statements are consistent with objective medical evidence and the other evidence."). Such evidence includes the claimant's "daily activities, medications or other treatments . . . to alleviate symptoms, the nature and frequency of the [claimant's] attempts to obtain medical treatment for symptoms; and statements by other people about the [claimant's] symptoms." *Id.*; *see also* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); SSR 16-3p, 82 Fed. Reg. at 49465–66; *Temples v. Comm'r of Soc. Sec.*, 515 F. App'x 460, 462 (6th Cir. 2013) (stating that an ALJ properly considered a claimant's ability to perform day-to-day activities in determining whether his testimony regarding his pain was credible). An ALJ may not find that a claimant's failure to seek treatment comparable with the degree of his complaints, or failure to comply with treatment, inconsistent with the evidence in the record without first "considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints." SSR 16-3p, 81 Fed. Reg. 14166, 14170 (Mar. 16, 2016) (noting that the ALJ may need to ask at an administrative hearing why the claimant has not sought or complied with treatment).

The ALJ failed to apply proper legal procedures and reach a decision supported by substantial evidence in evaluating Wilson's subjective symptom complaints. First, to the extent that Wilson asserts the ALJ gave undue weight to his daily activities at home, his delayed

treatment, and his dog walking, his arguments are unavailing because they invite the court to engage in impermissible re-weighing of the evidence. 42 U.S.C. §§ 405(g), 1383(c)(3); *Jones*, 336 F.3d at 476. Nonetheless, the ALJ failed to apply proper legal procedures in relying on Wilson's delayed treatment or treatment non-compliance, as nothing in his decision indicates that he considered Wilson's reasons for failing to seek treatment earlier or comply with his treatment – such as the impact of his agoraphobia or pre-appointment panic attacks – before finding his delayed treatment and noncompliance inconsistent with his subjective complaints. SSR 16-3p, 81 Fed. Reg. at 14170; *see generally* (Tr. 21–22). Further, substantial evidence did not support the ALJ's conclusion that Wilson's subjective complaints were inconsistent with the treatment gap between August 2015 and March 2016, because evidence in the record indicated that Wilson visited his treatment providers at Coleman and had his medications adjusted between those dates. (Tr. 546, 540, 534). Here, the Commissioner's argument that Wilson's counseling gap between February 2014 and December 2014 supported the ALJ's finding that Wilson's subjective complaints were inconsistent with the record is unavailing because: (1) it is an improper *post hoc* rationalization; and (2) the ALJ found that Wilson received treatment from his primary care physician during that period. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 50 (1983) (stating that "the courts may not accept appellate counsel's *post hoc* rationalizations for agency action"); (Tr. 22). Substantial evidence also did not support the ALJ's conclusion that Wilson's subjective symptom complaints regarding his inability to go into public places were inconsistent with his daily dog walking, as the ALJ's conclusion appears to rely on a misconstruction of Wilson's testimony, which indicated that he took his dog into his side yard and quickly returned indoors. (*Compare* Tr. 23–24, *with* Tr. 63–64). Although the ALJ properly considered Wilson's daily activities, including his statement to a treatment

provider that he attended church regularly, the court cannot determine whether the above-discussed errors were harmless, because the record does not indicate whether the ALJ would have reached the same conclusion absent those errors. *Rabbers*, 582 F.3d at 654; *Temples*, 515 F. App'x at 462; *Shrader*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012); SSR 12-2p, 77 Fed. Reg. at 43643; SSR 16-3p, 82 Fed. Reg. at 49465–66; 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). Accordingly, because the ALJ did not apply proper legal standards and reach a decision supported by substantial evidence, a remand is appropriate. *Bowen*, 478 F.3d at 746; *Rabbers*, 582 F.3d at 654.

### C.      Medical Opinions and the RFC Determination

Wilson argues that the ALJ failed to properly apply legal procedures and reach a conclusion supported by substantial evidence in weighing the medical opinion evidence and evaluating his RFC. ECF Doc. 13, Page ID# 720–22. He asserts that the ALJ did not adequately explain why he disregarded Dr. Tangeman's and Dr. Johnson's opinions that he was restricted to non-confrontational and constructive supervisory correction, despite stating that he gave their opinions great weight. *Id.* at 721. Further, Wilson contends that the ALJ failed to explain why he disregarded Dr. Sipps' opinion that Wilson would have significant problems dealing with work pressures outside his home. *Id.* at 722. Wilson also argues that the ALJ cherry-picked evidence by giving weight to some of his GAF scores, while discrediting others. *Id.* at 727–28. Finally, Wilson argues that the ALJ should have found that he was disabled, based on the VE's testimony that he would not be able to work if he had to miss work more than one day per month and take one or two unscheduled 20-minute breaks each day. *Id.* at 721. Thus, Wilson argues that the court should remand this case for further consideration because the ALJ did not build a logical bridge between the evidence and his RFC. *Id.*

The Commissioner responds that the ALJ was not required to adopt and incorporate into the RFC every restriction in the physicians' opinions, despite giving them great weight. ECF Doc. 15, Page ID# 796. The Commissioner also argues that the ALJ was not required to discuss each factor or piece of evidence in determining Wilson's RFC. *Id.* at 797. Instead, the Commissioner contends that the ALJ applied proper legal procedures and reached a decision supported by substantial evidence when he considered all the evidence in the record, explained the weight given to the medical opinions, and made decisions regarding which restrictions to incorporate into the RFC. *Id.* at 797–98. Furthermore, the Commissioner argues that evidence supported the ALJ's conclusion that Wilson could: (1) perform simple, routine and repetitive tasks at a non-production pace; (2) frequently interact with supervisors; (3) interact with coworkers and the general public on an incidental and superficial basis; and (4) respond appropriately to occasional changes in a routine work setting. *Id.* at 798–99. The Commissioner also asserts that the ALJ did not cherry-pick the evidence with regard to Wilson's GAF scores, but instead stated that none of the GAF scores were due any weight. *Id.* at 792–93. Thus, the Commissioner asserts that the ALJ adequately relied on the VE's testimony that Wilson could perform work in light of his RFC. *Id.* at 799.

In his reply, Wilson reiterates his arguments that the ALJ failed to adequately explain why he discredited the portions of Dr. Sipps', Dr. Tangeman's, and Dr. Johnson's opinions that showed he had limited ability to handle work pressures outside the home and supervisor correction. ECF Doc. 16, Page ID# 811–12. He argues that, because parts of Dr. Sipps', Dr. Tangeman's, and Dr. Johnson's opinions conflicted with the RFC, the ALJ was required to explain why he did not include the conflicting limitations in the RFC. *Id.* at 812.

At Step Four of the sequential analysis, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. §§ 404.1520(e), 416.920(e). The RFC is an assessment of a claimant's ability to do work despite his impairments. *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 61 Fed. Reg. 34474, 34475 (July 4, 1996)). "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by *all* of an individual's impairments, even those that are not 'severe.'" SSR 96-8p, 61 Fed. Reg. at 34477. Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant. 20 C.F.R. § 416.929(a).

In evaluating a claimant's RFC, the ALJ must weigh every medical opinion that the SSA receives. 20 C.F.R. §§ 404.1527(c), 416.927(c). An ALJ must give a treating physician's opinion controlling weight, unless the ALJ articulates good reasons for discounting that opinion. *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). If an ALJ does not give a treating physician's opinion controlling weight, he must determine the weight it is due by considering the length of the length and frequency of treatment, the supportability of the opinion, the consistency of the opinion with the record as a whole, and whether the treating physician is a specialist. *See Gayheart*, 710 F.3d at 376; 20 C.F.R. § 404.1527(c)(2)–(6), 416.927(c)(2)–(6). The ALJ must provide an explanation "sufficiently specific to make clear to any subsequent reviewers the weight the [ALJ] gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376; *see also Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011) ("In addition to balancing the factors to determine what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons for the weight he actually assigned."). Nevertheless, nothing in the regulations requires the ALJ

to explain how he considered each of the factors. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c); *see also Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804–05 (6th Cir. 2011) (noting that the regulations do not require "an exhaustive factor-by-factor analysis," so long as the ALJ has complied with the regulations' procedural safeguard by stating good reasons for the weight given to the treating source's opinion). When the ALJ fails to adequately explain the weight given to a treating physician's opinion, or otherwise fails to provide good reasons for rejecting a treating physician's opinion, remand is appropriate. *Cole*, 661 F.3d at 939.

"Even [when] an ALJ provides 'great weight' to an opinion, there is no requirement that an ALJ adopt [a medical source's] limitations wholesale." *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015) (unpublished). So long as the ALJ's RFC determination considered the entire record, the ALJ is permitted to make necessary decisions about which medical findings to credit and which to reject in determining the claimant's RFC. *See Justice v. Comm'r of Soc. Sec.*, 515 F. App'x 583, 587 (6th Cir. 2013) (unpublished ("The ALJ parsed the medical reports and made necessary decisions about which medical findings to credit, and which to reject. Contrary to [the claimant's] contention, the ALJ had the authority to make these determinations."). However, an ALJ improperly "cherry-picks" evidence when his decision does not recognize a conflict in the opinion evidence and explain why he chose to credit one portion over another. *See Rogers v. Comm'r of Soc. Sec.*, No. 5:17-cv-1087, 2018 WL 1933405 *13 (N.D. Ohio 2018) (citing *Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 435 (6th Cir. 2013)); *see also Fleischer v. Astrue*, 774 F. Supp. 2d 875 881 (N.D. Ohio 2011) (stating that, if a medical source's opinion contradicts the ALJ's RFC finding, the ALJ must explain why he did not include the limitation in his RFC determination).

A GAF score is "a clinician's subjective rating on a scale of zero to 100, of an individual's overall psychological functioning. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 503 n.7 (6th Cir. 2006). GAF scores assist in assessing a claimant's mental RFC, but they are not controlling or essential to the RFC determination. *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002); *see also Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Injury*, 65 Fed. Reg. 50746, 50764–65 (Aug. 21, 2000) (declining to endorse the GAF scale for use in the Social Security Administration's disability programs because "[i]t does not have a direct correlation to the severity requirements in our mental disorders listings").

At the final step of the sequential analysis, the burden shifts to the Commissioner to produce evidence supporting the contention that the claimant can perform a significant number of jobs in the national economy. *Howard*, 276 F.3d at 238; 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). An ALJ may determine that a clamant has the ability to adjust to other work in the national economy by relying on a vocational expert's testimony that the claimant has the ability to perform specific jobs. *Howard*, 276 F.3d at 238. A VE's testimony in response to a hypothetical question is substantial evidence when the question accurately portrays the claimant's RFC. *See id.* (stating that "substantial evidence may be produced through reliance on the testimony of a vocational expert (VE) in response to a 'hypothetical' question, but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments'" (internal quotation marks omitted)); *see also Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 715 (6th Cir. 2013) (unpublished) (stating that the ALJ's hypothetical question must "accurately portray[] a claimant's vocational abilities and limitations"). "An ALJ is only required to incorporate into a hypothetical question those limitations he finds credible." *Lee*, 529 F. App'x

at 715; *see also Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990) ("If the hypothetical question has support in the record, it need not reflect the claimant's unsubstantiated complaints.").

The ALJ failed to apply proper legal procedures and reach a decision supported by substantial evidence in determining Wilson's RFC in light of the medical opinion evidence. Because the ALJ considered all the record evidence in formulating Wilson's RFC, he was not required to adopt all of the limitations in Dr. Sipps', Dr. Tangeman's, and Dr. Johnston's opinions. *Reeves*, 618 F. App'x at 275; *Justice*, 515 F. App'x at 587; (Tr. 20). Further, the ALJ did not fail to apply proper legal procedures when he did not explicitly discuss Dr. Sipp's opinion – that Wilson "appear[ed] limited in his ability to respond appropriately to work pressures in a work setting" – because the RFC was consistent with Dr. Sipp's opinion, as it: (1) restricted Wilson from performing at a production rate pace; and (2) required changes in the work setting to be occasional, gradually introduced, and easily explained/demonstrated in advance. *Fleischer*, 774 F. Supp. 2d at 881; *Rogers*, No. 5:17-cv-1087, 2018 WL 1933405 *13; (Tr. 20, 498). Nevertheless, the ALJ failed to apply proper legal procedures when he did not explain his implicit decision to discredit Dr. Tangeman's and Dr. Johnston's opinions – that "[s]upervisory correction should be non-confronting and constructive" – which appears to conflict with the RFC finding that Wilson could "interact frequently with supervisors." *Fleischer*, 774 F. Supp. 2d at 881; *Rogers*, No. 5:17-cv-1087, 2018 WL 1933405 *13; (Tr. 20, 93, 106).

Wilson's argument that the ALJ's decision was inconsistent when he determined that all of the GAF scores in the record were due little weight, but also considered that the GAF scores showed Wilson improved with treatment, is unavailing as GAF scores may assist in, but are not

controlling in or essential to, formulating the RFC. *Kornecky*, 167 F. App'x at 503 n.7; *Howard*, 276 F.3d at 241; *see also Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Injury*, 65 Fed. Reg. at 50764–65; (Tr. 22–23). Upon remand, the ALJ should make it clear that any upward trajectory in Wilson's GAF scores did not provide a basis for and conclusion that Wilson was not disabled. Finally, Wilson's argument that the ALJ should have found him disabled based on the VE's testimony that he would not be able to work if had to miss more than one day per month and take one or two unscheduled 20-minute breaks is also unavailing, as the ALJ did not, and was not required to, incorporate those limitations into Wilson's RFC. *Howard*, 276 F.3d at 238; *Lee*, 529 F. App'x at 715; *Blacha*, 927 F.2d at 231; (Tr. 20, 80).

Notwithstanding the ALJ's application of proper legal procedures in evaluating Dr. Sipps' opinion, the GAF scores, and the VE's testimony; a remand is appropriate because the ALJ failed to apply proper legal procedures when he failed to explain why he did not incorporate Dr. Tangeman's and Dr. Johnston's opinion regarding Wilson's limited ability to interact with supervisors into the RFC. *Bowen*, 478 F.3d at 746; *Fleischer*, 774 F. Supp. 2d at 877; *Shrader*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012). At a minimum, the ALJ should have indicated whether he found any conflict between his RFC and the opinions of the state agency reviewing physicians. And, if he did, the ALJ should have explained why the limitation was omitted from the RFC.

## VI. Conclusion

The ALJ: (1) failed to apply proper legal standards and reach a decision supported by substantial evidence in evaluating Wilson's subjective symptom complaints; and (2) failed to apply proper legal procedures by not explaining why he did not incorporate Dr. Tangeman's and

Dr. Johnston's opinion that he had a limited ability to interact with supervisors into the RFC. Accordingly, the Commissioner's final decision denying Wilson's applications for disability insurance benefits and supplemental security income is VACATED and the case is REMANDED for further proceedings consistent with this memorandum of opinion and order.

IT IS SO ORDERED.

Dated: January 30, 2019

Thomas M. Parker
United States Magistrate Judge